Opinion issued May 10, 2012.


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00873-CR

NO. 01-10-00874-CR

———————————

TRACIE DENISE BELL, Appellant

V.

The State of Texas, Appellee



 



 

On Appeal from the 178th District Court

Harris County, Texas



Trial Court Case Nos. 1157495, 1224142

 



MEMORANDUM OPINION

          Tracie Denise Bell appeals from her
conviction for theft and attempted theft,[1] arguing that the trial
court erred in its refusal to submit “accomplice witness” jury instructions
with respect to certain witnesses. We affirm.

Background

          The
State charged Bell with theft and attempted theft in connection with funds she obtained
or sought to obtain from Debra King, Chief Financial Officer for the Houston
Area Urban League, in remuneration for youth basketball camps Bell purportedly conducted
through her nonprofit organization, The Youth Outlet. The State alleged that
Bell submitted falsified documents to the Urban League, claiming to have run
basketball camps that never took place and claiming that fictitious children
attended the camps, in order to obtain grant funds provided to the Urban League
by the American National Red Cross Hurricane Recovery Program for funding youth
activity programming for children directly affected by Hurricanes Katrina, Rita,
or Wilma. 

          Among
the witnesses who testified against Bell were Marcus Nasia,
Melba Hamilton, Evelyn Robinson, Vanessa Ausley, Stephanie
Simon, and Elliott Dupree—each of
whom assisted Bell to some degree in connection with the allegedly fraudulent
basketball camps and paperwork. At the charge conference, the trial court ruled
that, in the attempted theft case, it would instruct the jury that Dupree was
an accomplice witness as a matter of law and that the jury was to decide
whether Simon and Ausley were accomplice witnesses as
a matter of fact. Bell requested that the trial court also instruct the jury that
Hamilton, Robinson, and Nasia were accomplices as a
matter of law or, alternatively, instruct the jury to decide whether they were
accomplices as a matter of fact. The State argued that Hamilton, Robinson, and Nasia were not accomplice witnesses because there was no
evidence that they knew that Bell was going to use the paperwork they assisted
in filling out to commit or attempt to commit theft—i.e., they lacked the requisite mental state
for the crime charged. The trial court denied Bell’s requests for
accomplice-witness instructions with respect to Hamilton, Robinson, and Nasia. 

The jury convicted Bell on both
charges. On the conviction for theft of property with an aggregate value of $100,000 to $200,000, the
jury sentenced her to fifteen years’ confinement and assessed a $3,300 fine. On
the conviction for attempted theft of property with a value in excess of
$200,000, the jury sentenced her to sixteen years’ confinement and assessed a
$6,460 fine. Bell appeals the trial
court’s denial of her requested accomplice-witness instructions.

Standard of Review

          If the evidence at trial raises a
question of fact as to whether a witness is an accomplice, the trial court must
instruct the jury to decide whether the witness is an accomplice; if the
evidence conclusively establishes that a witness is an accomplice, the trial
court must instruct the jury that the witness is an accomplice as a matter of
law. Druery v. State, 225 S.W.3d 491, 498–99 (Tex. Crim. App.
2007). We review a trial court’s determination of whether the evidence supports
either accomplice-witness instruction under an abuse of discretion standard. Paredes v. State, 129 S.W.3d 530, 536 (Tex. Crim. App.
2004).

Accomplice-Witness Instruction

          Under
article 38.14 of the Code of Criminal Procedure, a criminal conviction may not
be based on the testimony of an
accomplice-witness unless the testimony is “corroborated by other evidence
tending to connect the defendant with the offense committed.” Tex. Code Crim. Proc. Ann. art. 38.14 (West 2011). A witness is an accomplice-witness only
if he participates in the crime with the defendant, taking “an affirmative act
. . . to assist in the commission of the [crime]” before, during, or after the
commission of the crime, with the required culpable mental state for the crime.
Druery, 225
S.W.3d at 498−99; see also Paredes, 129 S.W.3d at 536. Mere presence at the scene
of the crime does not render a witness an accomplice. Druery, 225 S.W.3d at 498; Cocke v. State, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). Nor is a witness
an accomplice merely because he knew of the crime and failed to disclose it or
even concealed it. Druery, 225 S.W.3d at 498.
In short, “if the witness cannot be prosecuted for the same offense with which
the defendant is charged, or a lesser-included offense, the witness is not an
accomplice witness as a matter of law.” Delacerda v. State, No. 01-09-00972-CR, 2011 WL 2931189, at *22 (Tex.
App.—Houston [1st Dist.] July 21, 2011, no pet.).




 

A.      Bell’s
theft conviction

Bell’s conviction for theft of property with an aggregate value of $100,000 to $200,000
relates to grant funds she received from the Urban League for a basketball camp
purportedly held at Hoffman Academy on June 18-28, 2007. Bell identifies no
evidence linking Nasia, Robinson, or Hamilton to that
transaction. Nasia testified, without refute, that
his involvement began in early-August 2007. Robinson testified, also without
refute, that she became involved in mid-August 2007. Hamilton likewise
testified that her involvement with Bell’s basketball camp endeavor began in
August 2007. Although a witness can be an accomplice based on after-the-fact
involvement in a crime, there is no evidence that any of Nasia’s,
Robinson’s, or Hamilton’s actions related to the Hoffman Academy basketball
camp; to the contrary, their testimony indicates that their actions were part
of Bell’s subsequent attempts to get additional funding from the Urban League
for basketball camps purportedly conducted after the Hoffman Academy camp.

We hold that, to the extent the trial court may have overruled
a request for an accomplice-witness instruction with respect to Nasia, Robinson, and Hamilton in the theft case against
Bell,[2]
the trial court did not abuse its discretion. 

B.      Bell’s
attempted-theft conviction

          Bell argues that Nasia,
Robinson, and Hamilton were accomplices to her attempted theft and the trial
court erred in refusing to submit an accomplice-witness instruction to the jury.
The State responds that there is no evidence that Nasia,
Robinson, or Hamilton had the necessary state of mind to be accomplices. We
agree with the State that there was no evidence that Nasia
or Robinson had the required intent for attempted theft, but we hold that there
was evidence that Hamilton, with the required intent, took an affirmative act
to assist Bell in the commission of her attempted theft. The trial court therefore
erred in refusing Bell’s request to instruct the jury to determine whether Hamilton
was an accomplice as a matter of fact. We hold, however, that the trial court’s
error was harmless in light of the extensive non-accomplice evidence connecting
Bell to the attempted theft.

1.       Marcus
Nasia

          Marcus Nasia
became involved in Bell’s basketball camp venture through his former wife, Vanessa
Ausley.[3]
Ausley recruited Nasia to
make copies of blank forms, which were subsequently filled out and submitted to
the Urban League. Ausley told Nasia
that Bell would pay him for the copies. Nasia testified
that he did not know the intended purpose for the forms when he made the copies
or the nature of his wife’s involvement. Nasia made
the requested copies—more than 10,000 copies according to him—and provided them
to Ausley and Bell.

Nasia testified that Ausley
later informed him that she and Bell needed assistance filling out some of the
forms. Ausley instructed Nasia
to “ask the kids” what to do with the forms, and he discovered that his
children had a list of names and had been using it to fill out forms. Using a
list provided by his son, Nasia also filled in ten to
fifteen sets of forms. He testified that he and his family completed all of the
information the forms called for except that they did not fill in the signature
block. 

Nasia subsequently discovered Ausley and his children signing the names in the forms’ signature
blocks. According to his testimony, he protested this with his family and
ultimately contacted the FBI and FEMA, because he believed Bell was using the
forms to obtain funds from FEMA that were designated to help children affected
by Hurricane Katrina. After contacting the authorities, Nasia
did not terminate all involvement with the project. At Ausley’s
request, he purchased some “white-out strips” for Bell. He also accepted
payment of $3,500 from Bell for the copying he had done, which he had paid for
on his account with the copy company. Nasia testified
that he felt he needed to be “kosher” with Bell in order to get evidence. He continued
to object to Ausley’s and his children’s involvement
in Bell’s enterprise, on which he discovered them working in his home and in
his office. He contacted FEMA and the FBI again. Because Bell was a police
officer, he also contacted the Houston Police Department’s Internal Affairs. 

When Bell became aware that the police were speaking with Nasia, she set up a meeting with Nasia
and Ausley to discuss how to handle the matter.
Internal Affairs recorded the conversation. Nasia
also turned over boxes containing the filled-out forms to Internal Affairs. Nasia testified that he was never concerned that he might
be charged with anything as a result of his involvement with Bell and never
discussed any deal with the police to ensure that he was not charged. Bell does
not contend that Nasia was ever charged with, or
promised immunity for, attempted theft or a lesser-included offense. Cf. Jester
v. State, 62 S.W.3d 851, 855−56 (Tex. App.—Texarkana 2001,
pet. ref’d) (explaining that grant of immunity may, but does not necessarily,
indicate that witness may be accomplice); see
also Moulton v. State, 508 S.W.2d 833, 836 (Tex. Crim. App. 1974) (holding
that witness is not necessarily accomplice even if State grants witness
immunity in exchange for testimony). 

Bell argues that there was evidence that Nasia
was an accomplice to her attempted theft on three grounds. First, Bell argues
that “Nasia’s inconsistent statements could be
interpreted in such a manner as to diminish his credibility in the eyes of the
jury, in light of his denials, being no more tha[n]
self[-]serving statements to avoid the consequences of his actions (common
knowledge of any prosecutor or lawyer appearing in a criminal court); he was
motivated by the payment of money to his wife and himself.” But Bell does not
identify any inconsistencies in Nasia’s testimony,
and Nasia’s denial of a criminal intent, alone,
cannot constitute evidence that he had a criminal intent. See State v. Krizan-Wilson, 354 S.W.3d 808, 816 (Tex. Crim.
App. 2011) (“It is not enough for appellee to argue that the trial court may
have disbelieved each and every witness that testified that the state had no
negative intentions for the delay, appellee must still present positive proof
of such an improper purpose.”); Janecka v.
State, 937 S.W.2d 456, 471–72
(Tex. Crim. App. 1996) (holding that, absent positive evidence of coercion,
appellant’s contention that jury “could have” disbelieved officer testimony or
“could have interpreted” officers’ statements as coercive was no evidence of
coercion); cf. Safeway Stores, Inc. v. White,
348 S.W.2d 162, 165 (Tex. 1961) (observing that jury is free to disbelieve
witness’s testimony about his beliefs but that testimony “is not evidence that
the opposite of what he said is true”); Gardner v. Hicks, No. 01-89-00271-CV,
1990 WL 84498, at *4 (Tex. App.—Houston [1st Dist.] June 21, 1990, no writ) (“a
jury cannot properly find the converse of a witness’ testimony when there is no
independent evidence to support such a finding”) (not designated for
publication) (op. on reh’g).

Moreover, taking Bell’s assertions about Nasia
as true, it does not tend to show that Nasia had the
necessary mental state for theft—specifically, that he assisted in Bell’s
attempt to unlawfully appropriate property with the intent to deprive the owner
of the property.[4] See Tex. Penal Code Ann. § 31.03(a) (West
2011); see also Druery,
225 S.W.3d at 498−99 (requiring evidence that witness took affirmative
act to assist in commission of crime with necessary criminal intent). Although Nasia made copies of blank forms in exchange for payment
and later assisted in partially filling-out some forms, there is no evidence
that Nasia knew at that time that Bell intended to
have the signatures on the forms forged or that she would turn in forms for
reimbursement regardless of whether the children for whom the forms were
filled-out had actually attended her basketball camp. To the contrary, the
evidence is that Nasia contacted the authorities when
he discovered his family forging signatures on the forms.

Bell next argues: “Secondly, [Nasia’s]
open hostility toward [Bell] for, in his mind, ‘seducing his wife with a
badge[,’] having her performing so many tasks for [Bell]; using his office for
the conduct of work on [Bell’s] endeavor; his incurring charges on his accounts
at the Office Depot and Office Max[.]” But Nasia’s
dislike for Bell is entirely consistent with his testimony that he believed
that Bell was engaged in illegal activities, had gotten his wife and children
involved with such activities, and had used his office and home to conduct such
activities. Moreover, even if Nasia’s dislike for
Bell resulted from some other source and may have motivated him to testify unfavorably
toward her, it is no evidence that he intended to assist Bell in unlawfully
depriving another person of her property. Cf.
Tex. Penal Code Ann. §
31.03(a); see also Druery,
225 S.W.3d at 498−499.

Finally, Bell argues: “That [] Nasia
was an accomplice is further supported by the Court’s own order dated March 17,
2008 designating him as one of several accomplices.” The order Bell cites is a
“Bail Condition and No Contact Order.” It does not identify Nasia
as an accomplice; it merely identifies him as a person with whom Bell was
prohibited from communicating while released on bail, along with numerous other
witnesses in the case. 

We therefore hold that the trial court did not abuse its
discretion in declining to submit an accomplice-witness jury instruction with
respect to Nasia.

2.       Evelyn
Robinson

          Robinson met Bell through Robinson’s
daughter, who dated Bell’s brother. Robinson’s sister, Melba Hamilton, also
knew Bell. In August 2007, Robinson was at her daughter’s house when her
daughter received a call from Hamilton and Bell. In the call, Bell invited
Robinson and her daughter to “make [some] money,” and they arranged for a
meeting at Hamilton’s house the following day. At the meeting, Robinson, her
daughter, and Hamilton filled out forms according to instructions from Bell,
who was not present. The forms were partially completed when the group started
working on them—they contained zip codes,[5]
race information, and camp information, but not the child’s name and contact
information. Robinson testified that, through Hamilton, Bell had directed them
to fill in the child information with names out of the phone book or with names
they made up, which they did. Robinson testified that she had no idea for what
Bell intended to use the forms and that, at the time she was filling out the
forms, she did not know that Bell would turn in the forms in exchange for money.
She stated that she would not have participated in filling in the forms if she
had known they would be used to obtain funds illegally. At one point Robinson
testified that she believed the forms would be used as “samples.” 

Robinson testified that she recruited other people to assist
in completing the forms, including her grandchildren, her nephew, and a friend
of her nephew. She also testified that Bell promised to pay them for filling
out the forms, but that she never received payment. As a result, she filed a
lawsuit in small claims court to recover the promised payment. In the lawsuit,
Bell denied having Robinson or her family members do work for her. Robinson
testified that if she had known that she was involved in illegal activity, she
would not have wanted to draw attention to it by filing a lawsuit against Bell
in small claims court. 

An investigator from the district attorney’s office
contacted Robinson, and she turned over all of the information and paperwork
she had relating to Bell and the lawsuit. Bell does not contend that Robinson
was ever charged with, or promised immunity for, attempted theft or a
lesser-included offense.

Bell argues that Robinson’s “impractical claim of ignorance
from another well[-]educated woman, a Registered Nurse, who most certainly was
aware that falsifying documents while in the performance of duties of her own
profession would be wrong and could implicate criminal charges, could very
likely adversely affect her credibility in the eyes of the jury.” Thus, Bell
contends, “[t]he jury could well have found that she did know she was
committing a wrongful act and therefore was an accomplice.” [6]


We agree with Bell that the jury could have concluded that
Robinson knew her conduct was “wrongful” based on the evidence that she filled
out forms with made-up names. But to raise an issue of fact on whether Robinson
was an accomplice witness, Bell must identify evidence that Robinson had the
criminal intent necessary for attempted theft—not merely evidence that Robinson
knew or should have known that something was not right about what she was
doing. See Druery,
225 S.W.3d at 498−99; see also Paredes, 129 S.W.3d at 537–38 (“Although [the
witness] may have suspected that foul play would occur when Torres arrived at
her house, there is no evidence suggesting that she assisted in the preparation
for or planning of the murders. [The witness] was not susceptible to
prosecution for capital murder or a lesser-included offense.”). Because there
was no evidence that Robinson intended to unlawfully deprive a person of their
property, she could not have been convicted of attempted theft.[7]
See Tex.
Penal Code Ann. § 31.03(a); cf.
Mize v. State, 915 S.W.2d 891, 896 (Tex. App.—Houston [1st Dist.] 1995,
pet. ref’d) (holding that fact issue existed on whether witness had required
intent to commit crime when evidence showed that witness saw robbery in progress
before participating in robbery by driving “get away
car”).

We therefore hold that the trial court did not abuse its
discretion in declining to submit an accomplice-witness jury instruction with
regard to Robinson.

3.       Melba
Hamilton

          Hamilton met Bell when Hamilton’s
niece—Robinson’s daughter—dated Bell’s brother. Hamilton’s business, “Training
Wheels,” provides business enhancement services such as setting up nonprofit
organizations, helping businesses incorporate, writing business and marketing
plans, writing grants, and creating brochures. Hamilton helped Bell set up her
nonprofit organization, “The Youth Outlet,” in 2002. In Summer
2007, Bell contacted Hamilton and asked her to fill out an online application
for Bell to participate in a program to provide summer camps through the Urban
League. Hamilton stated that she went to the Urban League’s website, but
because the deadline for the application was too soon, she told Bell that she
could not fill out the application for her. Hamilton said that she did not pay
attention to the contents of the online application because she looked first at
the due date, realizing immediately that it was too soon to allow her to help
Bell with the application.

Hamilton testified that Bell contacted her again later, telling
her that she had been able to get involved in the Urban League program.
According to Hamilton, Bell told her that “she was going to make a lot of
money. She told me that she was going to be rich and that she had gotten a big
check. I believe she said $40,000 and asked me if I had a nonprofit because I
could get in on it.” Hamilton was working on creating a nonprofit but had not
completed the process. After Hamilton told Bell that her nonprofit was not set
up yet, Bell invited Hamilton to meet her at Office Depot to “make $5,000.”
According to Hamilton, when she met Bell at Office Depot, Bell offered her
$1,500 to fill out some paperwork. Hamilton testified that Bell did not tell her what the forms were for or how they would be used. Although
she admitted that the forms contained the name “Houston Area Urban League” in a
top, left-hand corner, Hamilton pointed out that the font-size of the words was
small and asserted that she had not noticed them. 

Hamilton testified that Bell told her how to fill out the
forms, instructing her to sign in the signature block and to make up the names
to use in filling out the forms or to get names out of the phone book. Hamilton
admitted that she thought that making up the names was a little odd but stated
that she did not have any idea Bell would use the forms to attempt to get money
from the Urban League. She also stated that she did not make any connection
between the paperwork she was filling out and the Urban League program Bell had
previously discussed with her. 

          Following her meeting with Bell at
Office Depot, Hamilton recruited her sister, Robinson, her niece, her nephew,
and a friend of her nephew to help with the paperwork. Like Robinson, Hamilton
stated that the forms were partially completed when they began working on them.
She also testified that she noticed that the forms recorded a “camp cost” of
$750 per person. 

Hamilton testified that, when they were done with the
paperwork, she contacted Bell to let Bell know they had completed the paperwork
for 1,361 names. She testified that Bell responded, “Okay. I’ll turn those in.”
She testified that she matched up the paperwork—putting the time and attendance
sheets she and the others had filled out with the other forms—and turned the
paperwork over to Bell. She subsequently testified that, when she dropped the
paperwork off with Bell, Bell told her that she was going to turn the paperwork
in. Hamilton testified that this was the first time she realized that Bell
intended to do something else with the paperwork. 

Hamilton stated that, when she began to contact Bell
regarding the promised payment for the paperwork she and the others had done,
Bell told her that she was unable to submit the paperwork to the Urban League
because they were being audited. Hamilton testified that she understood this to
mean that Bell had turned in their paperwork to the Urban League and that this
was the first time she made the connection between the grant application Bell
had asked her to fill out and the paperwork. According to Hamilton, Bell
ultimately agreed to pay her, her sister, and her niece $1,000 each for the
paperwork. Although her sister turned down the money, Hamilton accepted it.
Hamilton testified that she felt “convicted” about the money after accepting it
and gave it away to “people that I knew that had needs.” 

Hamilton testified that she never had any concern that she
might be in any kind of trouble for her involvement with Bell and that no one
in the district attorney’s office ever told her that she could be in any kind
of trouble. Bell does not contend that Hamilton was ever charged with, or
promised immunity for, attempted theft or a lesser-included offense.

          




 

a.       The trial
court erred in refusing to instruct the jury to determine whether Hamilton was
an accomplice to Bell’s attempted theft

 

          Bell argues that “[a] jury could
reasonably conclude that Ms. Hamilton was not credible when she denied
knowledge of the wrongful character of what she was doing[,]
making up and copying names from a phone book. Especially in light of her
background and experience and the fact that she completed forms for 1,361 fully
manufactured names.”[8]
Whether Hamilton had knowledge of the wrongful nature of her actions is not the
test for an accomplice-witness instruction—there must be evidence that Hamilton
assisted Bell in Bell’s attempted theft with the intent of unlawfully depriving
a person of their property. See Tex. Penal Code Ann. § 31.03(a); Druery, 225
S.W.3d at 498−99; Paredes,
129 S.W.3d at 537–38. We hold that the evidence was sufficient to raise a fact
question as to whether Hamilton had such intent.

          Hamilton admitted that Bell asked her
to assist in applying to be a part of the Urban League’s summer camp program
and that she went to the Urban League’s website and viewed the application. She
also admitted that, in the same phone call in which Bell invited her to “make
$5,000,” Bell first informed her that she had been able to get involved in the
Urban League’s grant program and was going to get rich as a result. Bell also
invited Hamilton to “get in on it” with Hamilton’s own nonprofit before
inviting Hamilton to make money by assisting her. According to Hamilton, Bell
then asked her to fill out forms that said “Houston Area Urban League” on them
with made up names. Hamilton’s testimony establishes that she knew the forms
related to summer camps because she noticed that they identified a camp cost of
$750. Finally, Hamilton admitted that Bell informed her Bell was going to “turn
in” the fraudulent forms on several occasions. 

This is circumstantial evidence that Hamilton knew not only
that she was participating in some sort of fraudulent or wrongful endeavor, but
specifically that she was assisting Bell in unlawfully depriving the Urban
League of funds designated for summer camp programs. See Mize, 915 S.W.2d at 896. Because there
is conflicting evidence from Hamilton in which she denies this knowledge, the
evidence does not conclusively establish that Hamilton had the necessary state
of mind to be an accomplice; it raises a fact question for the jury to decide. See id. The trial court therefore abused
its discretion in refusing Bell’s request to instruct the jury to determine
whether Hamilton was an accomplice in fact. Having determined that the trial
court erred, we must next determine whether the error was harmful to Bell. Medina v. State, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999); Weathers
v. State, No. 01-09-00093-CR, 2010 WL 3212123, at *3 (Tex. App.—Houston [1st
Dist.] Aug. 12, 2010, pet. ref’d)
(mem. op., not designated for publication). We
reverse the trial court’s judgment only if we conclude that there was harm. Medina,
7 S.W.3d at 643; Weathers, 2010 WL 3212123, at *5.          

b.      The
error was harmless

Because the trial court erroneously denied Bell’s request
for an accomplice-as-a-matter-of-fact instruction as to Hamilton, we review the
record for “some harm” under the standard set forth in Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh’g), superseded on other grounds by rule as stated in
Rodriguez v. State, 758
S.W.2d 787 (Tex. Crim. App. 1988). See
Medina, 7 S.W.3d at 642−43. Under this
standard “possible harm” is not enough—there must be a showing of actual harm. Medina, 7 S.W.3d at 644; see also Almanza, 686 S.W.2d at 174 (stating that court
reviews record for “the actual, not just theoretical, harm”). “[T]he actual
degree of harm must be assayed in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of probative evidence,
the argument of counsel and any other relevant information revealed by the
record of the trial as a whole.” Almanza, 686 S.W.2d at 171.

Accomplice-witness testimony is
admissible and will support a conviction as long as it is “corroborated by
other evidence tending to connect the defendant with the offense committed[.]” Tex. Code Crim. Proc. Ann. art. 38.14. The corroborating evidence under
38.14 need not be sufficient, standing alone, to prove beyond a reasonable
doubt that Bell committed attempted theft. Joubert v. State, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). “All that is
required is that there is some non-accomplice evidence tending to
connect the defendant to the offense.” Id.
Thus, “[t]he erroneous omission of an instruction that tells the jury that
testimony must be corroborated generally is harmless unless the corroborating
evidence is ‘so unconvincing in fact as to render the
State’s overall case for conviction clearly and significantly less persuasive.’”
Weathers, 2010 WL 3212123, at *3 (citing Herron v. State, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)). In reviewing
the strength of the corroborating evidence, we examine both its reliability or
believability and the strength of its tendency to connect the defendant to the
crime. Id. (citing Herron, 86 S.W.3d at 632; Burks v. State, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994)).

Bell fails to present any argument to this Court as to how
she was harmed by the trial court’s failure to submit an accomplice-witness
instruction as to Hamilton or cite any evidence or legal authority to support
such a contention. Cf. Tex. R. App. P. 38.1(h) (requiring that
appellant’s brief contain “a clear and concise argument for the contentions
made, with appropriate citations to authorities and to the record”), 47.1
(requiring that court of appeals’s opinion address
all dispositive issues “raised” on appeal). The State points out that there was
copious corroborating evidence of attempted theft. There was testimonial
evidence—from witnesses who Bell does not contend were accomplices—and
documentation tending to show that Bell submitted fraudulent forms to the Urban
League and sought payment of grant funds for basketball camps reflected in the
forms. There were also inconsistencies in Bell’s statements to police about the
camps. 

Hamilton’s testimony that Bell instructed her to fill out
forms with made-up names finds some support in Robinson’s testimony that
Hamilton relayed that instruction to her and the others who met to fill out
forms for Bell. Even if we assumed that it was Hamilton’s idea to fabricate
names for the forms, and Bell knew nothing about it, there is other independent
evidence that Bell knew the forms she submitted to the Urban League were
fraudulent. Bell submitted forms representing that she conducted basketball camps
with certain times, locations, and attendance, but there was evidence at trial
that these camps did not have the attendance or time-span represented or never
occurred at all. This included documentation and testimony from
non-accomplice-witnesses tending to prove no basketball camps were conducted at
certain times and locations represented in the forms. There was also evidence
that some of the purported locations of camps could not possibly have
accommodated a basketball camp. 

For example, Bell submitted forms to the Urban League
seeking $264,750 for a basketball camp she allegedly conducted for more than
300 children from July 16, 2007 through August 6, 2007 at the “Young Youth
Recreation Center,” located at “1005 Martin Luther King” in Beaumont, Texas
77005. An investigating police officer testified at trial that he was unable to
find any information about a “Young Youth Recreation Center” and, when he went
to the location identified in the forms Bell submitted, there was only a vacant
lot. He testified that there was no recreation center at the address provided
and that the nearby addresses were not suitable for a basketball summer camp. Photographs
in evidence support the officer’s testimony.

The same officer looked into other locations at which Bell
allegedly hosted basketball camps in August 2007. He testified that one
location was a YMCA inside of a shopping mall; it was approximately the size of
two retail stores and filled with workout equipment; there were no basketball goals
or equipment in the YMCA or elsewhere in the mall or mall’s parking lot area;
and when he inquired about the possibility of hosting a basketball camp, an
employee at the YMCA referred him to another YMCA location that had a gymnasium
large enough to accommodate basketball practice. Bell submitted paperwork to
the Urban League claiming she hosted a basketball camp for nearly 100 children
at the in-mall YMCA. The officer testified that the YMCA space in the mall was
not large enough to accommodate basketball practice. 

The same officer also testified that one location at which
Bell purportedly held a basketball summer camp was second-floor office space. 

As another example, the evidence included time and
attendance forms for a basketball camp at Welch Middle School that Bell
purportedly hosted from August 6, 2007 through August 24, 2007. A teacher from
the school testified that Bell sometimes held practices for an AAU basketball team
at the school’s gymnasium in the evenings,[9]
but Bell did not host a basketball camp at the school. She testified that Bell
had inquired with her about using the school’s gym for a summer camp but that
she told Bell she did not think Bell would be able to get approval for that. She
also testified that, although she opened the gym for Bell’s evening basketball
practices, she never opened the gym for Bell any other time. She stated that
there was a “black top” area outside the gym where basketball could be played
but she never saw Bell hosting a summer camp there, even though she was teaching
at the school during the summer as well as the school year. The school’s
principal also testified that Bell never sought permission for a basketball
summer camp and that she never witnessed a basketball camp taking place at the
school. A fraud examiner from the Harris County district attorney’s office
testified that Bell wanted $345,000 from the Urban League for conducting this
camp, which she represented was attended by more than 400 children.

These are only examples of the evidence against Bell, which
was extensive. Given the substantial amount of non-accomplice evidence
connecting Bell to the attempted theft charged, we hold that the trial court’s
error in failing to give an accomplice-witness instruction concerning Hamilton
was harmless. 

Conclusion

The trial court did not abuse its discretion in denying
Bell’s request for accomplice-witness instructions with regard to Nasia and Robinson in the theft and attempted theft cases,
or with regard to Hamilton in the theft case. The trial court did abuse its
discretion in denying Bell’s request for an
accomplice-witness-as-a-matter-of-fact instruction with regard to Hamilton in
the attempted theft case, but the error was harmless in light of the
substantial evidence connecting Bell to the attempted theft. We therefore affirm
the trial court’s judgment.

 

 

                                                                   Harvey
Brown

                                                                   Justice


 

Panel
consists of Justices Bland, Massengale, and Brown.

Do
not publish. Tex. R. App. P. 47.2(b).











[1]
          See Tex. Penal Code Ann.
§§ 15.01, 31.03(a), (b), & (e)(6) (West 2011).





[2]
          The
reporter’s record appears to indicate that Bell’s request for an
accomplice-witness instruction with respect to Nasia,
Robinson, and Hamilton was limited to the attempted-theft case against her, as
was the trial court’s ruling. On appeal, however, Bell does not limit her issue
to the attempted-theft case.





[3]           Ausley played a significant role in Bell’s
basketball camp venture, and the trial court instructed the jury to determine
whether Ausley was an accomplice to Bell in the
attempted-theft case.





[4]           Bell does not argue that the evidence establishes or raises
a fact issue as to whether Nasia could have been
convicted of any lesser-included offense of attempted theft.





[5]           The forms required a statement that
the child lived in an identified zip code within thirty days before landfall of
Hurricane Katrina, Rita, or Wilma.





[6]
          As with Nasia,
Bell also cites to the trial court’s “Bail Condition and No Contact Order” as
identifying Robinson as an accomplice. But the order merely identifies
Robinson, along with other witnesses, as people whom Bell was prohibited from
contacting while released on bail.





[7]           Bell does not argue that the evidence establishes or raises
a fact issue as to whether Robinson could have been convicted of any
lesser-included offense of attempted theft.





[8]
          As with Nasia
and Robinson, Bell also cites to the trial court’s “Bail Condition and No
Contact Order” as identifying Hamilton as an accomplice. But the order merely
identifies Hamilton, along with other witnesses, as people whom Bell was prohibited
from contacting while released on bail.





[9]           Several witnesses testified that,
independent of the Urban League program, Bell coached an AAU basketball team.